UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: _____

| | |
|---|---|
| THOMAS J. SIMMONS,<br>Plaintiff<br><br>v.<br><br>SGT. ASHLEY B. SMITH of<br>THE NORTH CAROLINA<br>HIGHWAY PATROL, *in his*<br>*individual and official capacity*,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)    **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NOW COMES the Plaintiff, Thomas J. Simmons, by and through undersigned counsel, and files this Complaint.

## PRELIMINARY STATEMENT

1. This action is brought under 42 U.S.C. § 1983 for money damages to redress Defendant's violation of Plaintiff's rights as guaranteed by the Fourth Amendment of the United States Constitution. This Complaint also states a claim for Defendant's violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the North Carolina state common law tort of battery, and the North Carolina Constitution.

2. On May 25, 2024, Plaintiff Thomas J. Simmons suffered an epileptic seizure while driving on N.C. Highway 33 in Greenville, North Carolina,

causing him to lose control of his vehicle, a 2008 Mercury Sable. Mr. Simmons'
Mercury sideswiped another vehicle, a Mercedes driven by Mr. Willie Smith,
before hopping the sidewalk and crashing into a cement utility pole, coming to
a stop. 911 was called, and North Carolina Highway Patrol Sergeant Ashley B.
Smith was dispatched to the scene.

3. There, Mr. Willie Smith, who was accompanied by his grandchildren,
told Trooper Ashley Smith that he had observed Mr. Simmons and he appeared
to be having a seizure and suffering a medical emergency.

4. After observing and attempting to give directions to Mr. Simmons, who
continued to convulse in his vehicle, Trooper Smith broke the passenger-side
window. Simmons emerged from the car and Trooper Smith pressed him
against the back door. When Mr. Simmons, in a seizure-induced haze, pulled
his hands away after Trooper Smith tried to grab them, Smith told him, "I'm
gonna hurt you" and punched him in the face. Simmons collapsed to the
ground, and Smith dragged him by his ankle across concrete and rocks before
handcuffing him. The incident was captured by multiple video cameras.

5. Trooper Smith handcuffed Mr. Simmons, and an ambulance transported
him to the hospital. While Mr. Simmons was in the hospital, Trooper Smith
filed charges of Assault on a Government Official, Reckless Driving, and
Resisting, Delaying and Obstructing an Officer against him. After multiple
court dates spanning nearly a year, during which time Trooper Smith, by way

of the Pitt County District Attorney's Office, unsuccessfully attempted to obtain a waiver of civil liability from Mr. Simmons in exchange for the abandonment of the criminal charges, the Pitt County District Attorney dismissed all charges against him.

6. Plaintiff seeks damages for the violation of his right to be free from the use of excessive force, unreasonable seizure, and malicious or wrongful prosecution under the Fourth Amendment and Article I §§ 19 and 20 of the North Carolina Constitution; for disability-based discrimination under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and for the state law tort of battery.

## JURISDICTION AND VENUE

7. Jurisdiction exists for this action pursuant to 42 U.S.C. § 1983, the Fourth Amendment to the United States Constitution, and 42 U.S.C. § 1988 (providing for attorney fees and litigation expense awards in actions arising under 42 U.S.C. § 1983). The Court has jurisdiction of this action under §1331, §1343, and §12101 *et. seq*. Supplemental jurisdiction over Plaintiff's state law and state constitutional claims is pursuant to 28 U.S.C. §1367.

8. Venue is proper in this district under 28 U.S.C. §1391(b), because the acts and omissions giving rise to Plaintiff's claims occurred in Pitt County. Therefore, the appropriate venue for this action is the United States District Court for the Eastern District of North Carolina.

## PARTIES

9. **Thomas Justin Simmons** (hereinafter "Plaintiff") is a Native American male who was 44-years-old at the time of the incident giving rise to this Complaint. He is a citizen and resident of Pitt County, North Carolina.

10. **Ashley B. Smith** (hereinafter "Defendant") is a Sergeant with the North Carolina State Highway Patrol. Upon information and belief, Mr. Smith is a citizen and resident of the Eastern District of North Carolina. On May 25, 2024, Sgt. Smith responded to a car crash in Greenville, North Carolina involving the Plaintiff, Thomas Simmons.

11. **North Carolina State Highway Patrol** (hereinafter "NC Highway Patrol") is a North Carolina State Agency responsible for highway safety and law enforcement throughout the State. NC Highway Patrol's mission is to make the highways safer, reduce crime, and respond to disasters. Upon information and belief, NC Highway Patrol is a division of the North Carolina Department of Public Safety.

## FACTUAL ALLEGATIONS

12. On May 25, 2024, Plaintiff Thomas J. Simmons was 44-years-old, living in Greenville, NC, and working part-time as a driver for Wal-Mart.

13. Simmons had recently begun working again at a job that allowed him to work intermittently, as he struggled to manage a particularly acute diagnosis of Crohn's disease, a chronic inflammatory bowel disease for which

there is no known cure. As recently as 2022, Simmons had been employed full-time with the North Carolina Department of Adult Corrections (NCDAC), working as a Correctional Behavioral Specialist II at Maury C.I. in Hookerton, NC. However, repeated absences attributable to his Crohn's disease and an incident in which Simmons suffered, for the first time, on September 10, 2021, a debilitating epileptic seizure while working alone in the presence of maximum-security prisoners, culminated in the Department putting him on long term disability. A second seizure followed on Thanksgiving Day 2021, prompting Simmons, at the advice of his neurologist, to stop driving. In 2022, his medical condition forced him to stop working for NCDAC.

14.    By 2024, Plaintiff Simmons had gone more than two years without having a seizure. In consultation with his doctors, he began to drive again, with the hope and expectation that the seizures were unlikely to recur.

15.    On May 25, 2024, Plaintiff was driving a 2008 Mercury Sable on North Carolina Highway 33 in Greenville, NC. In the backseat were items that he was preparing to deliver to a customer. As Plaintiff drove down the street, he suffered an epileptic seizure.

16.    Plaintiff lost consciousness and control of his vehicle. His car sideswiped a Mercedes Benz driven by Mr. Willie Smith before crashing into a cement utility pole, causing it to topple over. Mr. Smith's Mercedes suffered an

estimated $600 in damages. Mr. Simmons' Mercury, which made direct impact with the pole, was a total loss.

17.    A witness to the accident called 911. Sergeant Ashley B. Smith of the North Carolina Highway Patrol responded to the scene, where he encountered Mr. Willie Smith (no relation), who told him the man inside the Mercury Sable appeared to be having a seizure. Shortly thereafter, officers from Greenville Police Department also arrived at the scene.

18.    Sgt. Smith's patrol car was equipped with a dash camera, and Greenville police officers present were wearing body cameras. These cameras recorded the scene from multiple angles.

19.    As he approached the scene of the wreck, Sgt. Smith made statements indicating he understood Plaintiff was suffering from a seizure. He told dispatch, "Notify Greenville PD, I believe somebody advised that the subject's possibly having a seizure. They've hit a light pole, and the pole is down in the road." Shortly after he stepped out of his vehicle, a bystander stated to him, "He's seizing," to which Smith replied, "He's seizing."

20.    In an application for a search warrant for Mr. Simmons' hospital records that Sgt. Smith prepared on June 24, 2024, Smith wrote that when he first encountered Plaintiff, he "was slumped over and appeared to be suffering from what I originally thought was a seizure or medical condition based on what witnesses on scene were telling me and what I was observing from him."

6

21.     Sgt. Smith approached Mr. Simmons' wrecked Mercury Sable and could see Simmons convulsing inside his vehicle.

22.     As Plaintiff continued to seize, Defendant used his baton to break Plaintiff's front passenger-side window.

23.     Defendant opened the passenger-side front door and leaned into the front area of the car, stating, "Hey brother, you alright? Shit. Hey man, be still, brother. Be still."

24.     Despite not observing any narcotics in the vehicle, Defendant Smith then backed out of the vehicle and stated to onlookers, "Looks like a drug problem. Y'all step on back."

25.     Defendant Smith continued to speak to Plaintiff, asking him, "Hey man, what's your name, brother?" During this time, Plaintiff continued to moan and cry unintelligibly.

26.     Plaintiff began to push on the driver's side door. The door was blocked from opening all the way because of the fallen cement utility pole, but opened enough for Plaintiff to get out for the first time throughout the encounter.

27.     With the door partially open, Plaintiff woozily rose to his feet, continuing to moan loudly, and prompting Defendant to say to Plaintiff, "Don't get out. Hey, I'm gonna hurt you, man."

28. When Plaintiff did not respond to Defendant's commands, Defendant Smith grabbed him forcefully and began to push him against the back, driver's side door of the car.

29. As the men stood next to Plaintiff's driver's side door, Defendant grabbed Plaintiff's hands, prompting Plaintiff—involuntarily—to pull them away from Defendant.

30. Defendant again stated, "I'm gonna hurt you, man." One second later, he delivered a forceful, closed fist strike directly to Plaintiff's face.



31. Defendant's punch to Plaintiff's head occurred while he was having or emerging from an epileptic seizure and immediately after he had collided with a utility pole with enough force to total his car.



32.     Plaintiff immediately slumped to the ground.

  

33.     As paramedics stood by, Defendant began to drag Plaintiff's body by his leg, across the pavement and gravel, and away from his vehicle.

34.     Defendant, with assistance from a Greenville PD officer, handcuffed Plaintiff's hands. At this point, it was apparent that Plaintiff was bleeding from multiple places on his body.

  

35.     Defendant, without any evidence or information supporting the assertion, told one or more of the Greenville police officers who by then had arrived on scene that Plaintiff was "on meth," and that he had to use force against Plaintiff. One Greenville officer asked another, "Was he combative?" The officer responded, "Trooper punched him in the face."

36.     Relying on Defendant's false assertion that Plaintiff was behaving strangely because he was on methamphetamine, one of the officers directed another to ride in the ambulance with him, stating, "Hey Edwards, just park your car and ride with them, since he's, like, strung out on meth—in case y'all got to fight."

37.     Later, in his room at the East Carolina University hospital, Plaintiff came to his senses.

38.     Defendant entered Plaintiff's room and told him he had punched him in the face.

39.     Defendant interrogated Plaintiff about methamphetamine while Plaintiff laid in his hospital bed. Plaintiff denied using the drug and explained to Defendant that he had suffered an epileptic seizure while driving.

40.     Defendant then told Plaintiff that he would be charging him with Assault on a Government Official, Reckless Driving, and a resisting an officer charge, confusing Plaintiff and causing him great emotional distress.

41.     After leaving the hospital room, according to a written report Defendant prepared on June 10, 2024, he approached the medical staff and told them they were "requir[ed]" by law to produce to him a copy of Plaintiff's blood tests without a warrant.

42.     The hospital staff disagreed with Defendant and refused to cooperate with his demand. Defendant Smith would nevertheless later falsely

suggest to Highway Patrol officials in his use of force report that medical staff indicated Plaintiff had been impaired, although Defendant did not file charges for Driving While Impaired.

43.    In fact, Plaintiff's blood tests disproved Defendant's suspicions.

44.    For the next eleven months, Plaintiff made repeated appearances in court, attempting to dispose of his charges. Defendant Smith attended court and conferred with prosecutors about Plaintiff's case. As Plaintiff's case was in state district court, the first defense counsel he retained was not provided with, and did not see, the dash and body cameras that captured the incident.[1]

45.    During this time, the Pitt County Assistant District Attorney communicated a plea offer to Plaintiff's first defense counsel in which the State would dismiss all criminal charges against Plaintiff if he would sign a waiver of all civil claims he might have against Defendant Smith.

46.    Plaintiff declined the State's offer. Shortly thereafter, he received a letter in the mail from his hired counsel that he was dismissing him as a client because Plaintiff would not accept the State's offer. Despite taking Mr. Simmons' case and extending the plea offer, Plaintiff's hired counsel later told

---

[1] *See* <u>State v. Cornett</u>, 177 N.C. App. 452, 455–56, 629 S.E.2d 857, 859 (2006) ("In North Carolina, no statutory right to discovery exists for criminal cases originating in district court."); <u>State v. Cunningham</u>, 108 N.C. App. 185, 195, 423 S.E.2d 802, 808 (1992) (stating that North Carolina "does not violate the Due Process Clause of the Federal Constitution when it fails to grant pretrial disclosure of material relevant to defense preparation").

undersigned counsel, Ms. Miller, that he would not continue to represent Plaintiff because he had a personal relationship with Defendant.

47.     Plaintiff obtained another attorney, who notified the State of his intent to take the charges to trial, at which point the State dismissed them unconditionally.

48.     Plaintiff continues to suffer significant physical and psychological injuries as a result of Defendant's unreasonable and unlawful actions.

49.     In the months following the incident, Plaintiff was diagnosed with Post Traumatic Stress Disorder, Anxiety, and Depression. He continues to seek medical services in relation to his encounter with Defendant.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – Fourth Amendment
Excessive Force
*On Behalf of Plaintiff Against Defendant Smith
in his individual capacity*

50.     All previous paragraphs are incorporated as if fully set forth herein.

51.     Defendant Ashley B. Smith punched Plaintiff Thomas J. Simmons in the face with a closed fist while Plaintiff was experiencing the effects of, and was in the process of emerging from, an epileptic seizure, and immediately following his involvement in a serious traffic accident.

52.    Given that witnesses on the scene informed Sgt. Smith Mr. Simmons was having a seizure, it was objectively unreasonable and violative of the Fourth Amendment for Sgt. Smith to assume Plaintiff was "on meth," as opposed to having a medical emergency, and to seize him by way of a significant use of force, as if he had committed a criminal offense, when he had not.[2]

53.    Defendant's closed fist strike to Plaintiff's face under these circumstances violated Plaintiff's right to be free of excessive force, in violation of the Fourth Amendment to the U.S. Constitution.[3]

54.    Whether Sergeant Smith in fact believed that Plaintiff was "on meth" is irrelevant, because the Fourth Amendment does not shield officers from liability when they make unreasonable mistakes of fact. Kentucky v. King, 563 U.S. 452, 464 (2011).[4]

---

[2] *Cf.* Thompson v. Anoka-Hennepin E. Metro Narcotics, 673 F. Supp. 2d 805, 814–15 (D. Minn. 2009) (holding that officers violated Fourth Amendment where "the information upon which they relied" did not reasonably support their belief that Plaintiff was involved in drugs and "seriously undermine[d] the reasonableness of the individual officers' decision . . . to seize the Plaintiffs").

[3] *See, e.g.,* Wilson v. Painter, No. 3:20CV645 (DJN), 2020 WL 7497801, at *12-13 (E.D. Va. Dec. 21, 2020) (stating Fourth Circuit law clearly established that "striking a suspect in the face with a closed fist constitutes excessive force" where suspect was being investigated for involvement in a potential traffic accident and did not immediately follow the officer's commands to exit vehicle), *aff'd,* No. 21-1083, 2021 WL 5851070 (4th Cir. Dec. 9, 2021); Clem v. Corbeau, 284 F.3d 543, 552 (4th Cir. 2002) (affirming denial of qualified immunity on excessive force claim against police officer and stating that, "viewed in the light most favorable to [plaintiff], the evidence is that [he was] . . . mentally disabled, confused . . . [and] unable to threaten anyone").

[4] *See also* Amisi v. Brooks, 93 F.4th 659, 667–68 (4th Cir. 2024); Henry v. Purnell, 652 F.3d 524, 532 (4th Cir. 2011).

13

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment
### Unreasonable Seizure
### *On Behalf of Plaintiff Against Defendant Smith*
### *in his individual capacity*

55.     All previous paragraphs are incorporated as if fully set forth herein.

56.     After being punched in the face, Plaintiff immediately collapsed to the ground, and Sergeant Smith dragged him across gravel and pavement by his leg and handcuffed him behind his back.

57.     Plaintiff was handcuffed even though he was not transported to the police station or the jail and there was no attempt to take him into custody after he was later discharged from the hospital.

58.     Police effect a seizure when they, "by means of physical force . . . in some way restrain the liberty of a citizen." <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968).[5]

59.     Defendant handcuffed Plaintiff tightly, enough to leave visible marks on his wrists well after they were removed. Defendant's handcuffing and dragging of Plaintiff at a time when he was experiencing the effects of an epileptic seizure and had just been involved in a serious car accident—and in

---

[5] *See also* <u>Carver v. City of Cincinnati</u>, 474 F.3d 283, 286 (6th Cir. 2007) (stating that a person is seized where a "state act[or] . . . applies force . . . with the intent of acquiring physical control"); *cf.* <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 200 (1989) (stating that is the state's "impos[ition] on [a person's] freedom to act on his own behalf" that confers the affirmative duty to protect).

the absence of objective evidence that Plaintiff had committed any crime—violated Plaintiff's right to be free from unreasonable seizures under the Fourth Amendment.[6]

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourth Amendment**
**Making a Material Misrepresentation to Effect**
**an Arrest That Otherwise Lacked Probable Cause**
***On Behalf of Plaintiff Against Defendant Smith***
***in his individual capacity***

60.     All previous paragraphs are incorporated as if fully set forth herein.

61.     After punching him in the face, Defendant Smith falsely, or with reckless disregard for the truth, charged Plaintiff with the North Carolina criminal offenses of *Assault on a Government Official* and *Resist, Delay, and Obstructing an Officer*.

62.     In sworn court documents, Defendant Smith wrote that there was probable cause that Plaintiff "did unlawfully and willfully assault and strike" him. *N.C. Uniform Citation*, State v. Simmons, No. 2024-CR-705837, Citation

---

[6] *See, e.g.*, E.W. by & through T.W. v. Dolgos, 884 F.3d 172, 180 (4th Cir. 2018) ("[T]his Court has never held that using handcuffs is *per se* reasonable. Rather, the Fourth Amendment requires us to assess the reasonableness of using handcuffs based on the circumstances."); Hamstead v. Walker, No. 3:18-CV-79, 2019 WL 12313478, at *6–8 (N.D.W. Va. May 7, 2019) (denying Trooper's motion to dismiss excessive force claim where he "drug [plaintiff] across the gravel parking lot" and "placed her in handcuffs behind her back as she lay helpless"), *aff'd sub nom.* Hamstead v. W. Virginia State Police, 841 F. App'x 615 (4th Cir. 2021).

No. 7337H26 (Pitt Co. Super. Ct. May 25, 2024). However, as demonstrated by Defendant's body and dash camera videos, Plaintiff never "struck" Defendant.

63.     These charges were ultimately dismissed by the District Attorney. However, this occurred only after Defendant took steps to try and leverage the false charges, unsuccessfully, into a signed waiver of any civil claims Plaintiff might have against Defendant.[7]

64.     "[T]he Constitution d[oes] not permit a police officer [,] . . . with reckless disregard for the truth, to make material misrepresentations or omissions to seek [an arrest] warrant that would otherwise be without probable cause." Miller v. Prince George's Cnty., Md., 475 F.3d 621, 632 (4th Cir. 2007).[8]

65.     A person seized pursuant to legal process but in the absence of probable cause, whose charges are ultimately resolved in their favor, may bring a Fourth Amendment claim against the officer who initiated the charge. Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 183–84 (4th Cir. 1996).

---

[7] See Town of Newton v. Rumery, 480 U.S. 386, 392–97 (1987) (acknowledging "substantial basis for th[e] concern" that release-dismissal agreements can function to "'suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights,'" and holding that where they do, they "offend public policy" and are unenforceable).

[8] See also Albright v. Oliver, 510 U.S. 266, 271 (1994) ("We hold that it is the Fourth Amendment . . . under which petitioner Albright's claim [alleging arrest pursuant to a warrant subsequently found to have been obtained without probable cause] must be judged."); Malley v. Briggs, 475 U.S. 335, 343–44 (1986) ("[I]t would be incongruous to test police behavior by the 'objective reasonableness' standard in a suppression hearing, while exempting police conduct in applying for an arrest or search warrant from any scrutiny whatsoever in a § 1983 damages action." (internal citation omitted)).

66. Defendant's filing of false criminal charges against Plaintiff, which were initiated in an apparent attempt to gain leverage over the Plaintiff, and to facilitate a coverup of Defendant's unlawful battery of Plaintiff, caused Plaintiff to be unlawfully seized and subjected to criminal legal process, in violation of his rights under the Fourth Amendment.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. 12132
### Americans with Disabilities Act
### *On Behalf of Plaintiff Against Defendant Smith*
### *in his individual and official capacities*

67. All previous paragraphs are incorporated as if fully set forth herein.

68. Plaintiff has a physical and mental impairment—epilepsy—that substantially limits his major life activities. He has a documented medical history of such an impairment. On the day Defendant Smith encountered him, Defendant regarded him as having such an impairment.[9]

69. As a person having a medical emergency and as someone who was the subject of a police call for service, Plaintiff was entitled to receive non-

---

[9] Waskey v. Leslie, No. 1:21-CV-00189-MR-WCM, 2021 WL 3199222, at *2–3 (W.D.N.C. July 28, 2021) (stating that a person establishes the first element of a Title II claim where she alleges she "(1) has 'a physical or mental impairment that substantially limits one or more major life activities . . .'; (2) has 'a record of such an impairment'; or (3) is 'regarded as having such an impairment'").

discriminatory police services, but he did not, because of his disability and/or the symptoms or manifestations of his disability.[10]

70.     Plaintiff was suffering from an epileptic seizure when Defendant Smith arrived on the scene of his vehicle crash. Plaintiff has a history of epileptic seizures. His seizure on May 25, 2024 was his third seizure since September 10, 2021. The 2021 seizure was so disruptive to his life that it led to him going on disability, leaving his work as a Behavioral Specialist II at Maury Correctional Institution, and to seek the services of a neurologist.

71.     Upon arriving at the scene on May 25, 2024, Defendant Smith was informed by Mr. Willie Smith that Plaintiff appeared to be having a seizure. Defendant Smith made statements, recorded on video, that indicated he understood Plaintiff Simmons to be experiencing a seizure.

72.     Defendant Smith later wrote in an affidavit that Plaintiff "appeared to be suffering from *what I originally thought was a seizure or medical condition* based on what witnesses on scene were telling me and what I was observing from him." Sergeant Ashley B. Smith, Probable Cause

---

[10] Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005) (stating that "a plaintiff seeking recovery for violation of [the ADA] must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability" (citing Baird v. Rose, 192 F.3d 462, 467–70 (4th Cir. 1999); Doe v. University of Md. Med. Sys. Corp., 50 F.3d 1261, 1264–65 & n.9 (4th Cir. 1995)).

Affidavit for Search Warrant for Thomas J. Simmon's Medical Records, June 4, 2024 (emphasis added).

73.     Defendant Smith attempted to give directions to Plaintiff Simmons. However, Plaintiff, throughout the recorded encounter, never responded verbally with intelligible words. Plaintiff can be heard, at various times, making moaning or groaning noises while convulsing and moving erratically and involuntarily.

74.     Under these circumstances, a reasonable police officer would have understood Plaintiff was suffering a seizure or some other kind of serious medical affliction.

75.     When Defendant attempted to grab Plaintiff by the hands and Plaintiff involuntarily pulled them away, Defendant punched Plaintiff with a closed fist in his face.

76.     Defendant later wrote that he punched Plaintiff in order to facilitate first responders' ability to "render aid" to him.

77.     Under the ADA, "[a]n individual is regarded as being disabled if he is regarded or perceived, albeit erroneously, as having an impairment that substantially limits one or more of his major life activities." Haulbrook v. Michelin N. Am., 252 F.3d 696, 703 (4th Cir. 2001) (citing 42 U.S.C.A. § 12102(2)).

78.     "[E]pilepsy is one of the disabling conditions that Congress contemplated when it passed the ADA." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001) (citing H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 52, *reprinted in* 1990 U.S.C.C.A.N. 303, 334).

79.     An officer engages in disability-based discrimination in violation of the ADA when they, acting with knowledge of a person's disability, effectuate their seizure in a way that does not reasonably accommodate their disability.[11]

80.     It is objectively unreasonable for a police officer to punch a person in the head who they think is "suffering . . . a seizure or medical condition" and who they know has just been involved in a serious car accident, all in an attempt to "render aid" to them.

81.     Defendant Smith admitted his awareness of Plaintiff Simmons' disabling condition. Instead of helping him, he punched him in the face, causing him physical and psychological injury and violating his rights under the Americans with Disabilities Act.

---

[11] *See, e.g.*, Sheehan v. City & Cnty. of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014) (stating the "ADA applies broadly to police 'services, programs, or activities'; that "the majority of circuits [that] have addressed the question [have concluded] that Title II [of the ADA] applies to arrests"; that "the Fourth Circuit [has] . . . consider[ed] a reasonable accommodation claim involving an arrest"; and that the ADA applies where "police properly . . . arrest a person with a disability . . . [but] fail to reasonably accommodate the person's disability in the course of . . . arrest"), *rev'd on other grounds, cert. dismissed in part sub nom.* City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015).

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT**
**29 U.S.C. § 794(a)**
*On Behalf of Plaintiff Against Defendant Smith*
*in his individual and official capacities*

125.    All preceding paragraphs are incorporated as if fully set out herein.

126.    A State may waive its Eleventh Amendment immunity and consent to suit in federal court. *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999).

127.    A State institution implicitly waives its Eleventh Amendment immunity "by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005) (quoting *Litman v. George Mason Univ.,* 186 F.3d 544, 550 (4th Cir.1999)).

128.    Additionally, 42 U.S.C. § 2000d–7(a)(1) provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, Title VI of the Civil Rights Act of 1964, or the

provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."

129.  NC State Highway Patrol and the State of North Carolina accept federal funds and participate in federal spending programs and, therefore, have waived constitutional immunity to claims under § 504 of the Rehabilitation Act.

130.  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

131.  Like a claim under the ADA, a plaintiff seeking recovery for violation of § 504 of the Rehabilitation Act must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Baird v. Rose,* 192 F.3d 462, 467–70 (4th Cir.1999); *Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1264–65 & n. 9 (4th Cir.1995).

132.  Mr. Simmons has a disability as defined under Section 504 of the Rehabilitation Act.

133. As discussed in Plaintiff's Fourth Claim for Relief, Defendant Smith was aware Mr. Simmons was having a seizure. Defendant Smith admitted his awareness of Plaintiff Simmons' disabling condition.

134. As a person having a medical emergency and as someone who was the subject of a police call for service, Mr. Simmons was entitled to receive non-discriminatory police services, but he did not, because of his disability and/or the symptoms or manifestations of his disability.

135. Mr. Simmons was discriminated against when Defendant punched him in the face while he was having a medical emergency stemming from the symptoms of his disability, despite the fact that he was not committing any crime and Defendant was aware of his disability.

136. NC Highway Patrol is vicariously liable for Defendant Smith's violation of § 504 of the Rehabilitation Act because the violation occurred while Defendant Smith was acting within the scope of his employment and NC Highway Patrol has control over officers employed with the state agency.

137. Because Defendant continues to live in North Carolina and is entitled to receive non-discriminatory police services, he continues to be at risk for discrimination.

### SIXTH CLAIM FOR RELIEF
**North Carolina Common Law**
**Battery**
***On Behalf of Plaintiff Against Defendant Smith***
***in his individual capacity***

82.     All previous paragraphs are incorporated as if fully set forth herein.

83.     The Supreme Court of North Carolina has said that "[t]he interest protected by the action for battery is freedom from intentional and unpermitted contact with one's person[.]" Dickens v. Puryear, 276 S.E.2d 325, 330 (N.C. 1981).

84.     In Dickens, the Court indicated that the N.C. Court of Appeals case, McCracken v. Sloan, 252 S.E.2d 250 (N.C. App. 1979), properly identified the contours of the battery tort. Id.

85.     In McCracken, the N.C. Court of Appeals wrote:

> The interest in freedom from intentional and unpermitted contacts with the plaintiff's person is protected by the action for battery. . . . The gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff.

> 252 S.E.2d at 252.

86.     Defendant Smith made intentional and unpermitted physical contact with Plaintiff when he punched Plaintiff in the face with a closed fist, causing Plaintiff cognizable injuries. In doing so, Defendant acted with malice.

## SEVENTH CLAIM FOR RELIEF
### N.C. Const. Art. I, § 20 - Unreasonable Seizure
### North Carolina Common Law - *Corum* Claim
### *On Behalf of Plaintiff Against Defendant Smith*
### *in his official capacity*

87.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

88.    Defendant Smith was acting in his official capacity as a law enforcement officer when he violated Mr. Simmons' right to be free from unreasonable seizure.

89.    The North Carolina Supreme Court "has recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights." Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992).

90.    When there is no adequate state remedy available, North Carolina common law "guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional [] rights." Id.

91.    "[W]hen public officials invade or threaten to invade the personal or property rights of a citizen in disregard of law, they are not relieved from responsibility by the doctrine of sovereign immunity even though they act or assume to act under the authority and pursuant to the directions of the State." Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761, 786, 413 S.E.2d 276, 292 (1992).

92.    Article I, § 20 of the North Carolina Constitution prohibits unreasonable seizures. State v. Otto, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012).

93.     North Carolina appellate courts have construed search and seizure provisions in the North Carolina and federal constitutions as protecting the same rights against unreasonable searches and seizures. Id.

94.     However, North Carolina courts have also held that the rights secured under the North Carolina Constitution are broader than those secured under the federal constitution. *See, e.g.*, Virmani v. Presbyterian Health Servs. Corp., 350 N.C. 449, 475 (1999) (stating that "the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution"); Jones v. Graham Cnty. Bd. of Educ., 197 N.C. App. 279, 289–93, (2009) (noting that "[i]f we determine that the policy does not violate the Fourth Amendment, we may then proceed to determine whether Article I, Section 20 provides basic rights in addition to those guaranteed by the [Fourth Amendment]" (quotation omitted)).

95.     As discussed in Plaintiff's Second Claim of Relief, Defendant Smith violated Plaintiff's right to be free from unreasonable seizure under the N.C. Constitution when he handcuffed Mr. Simmons, drug him across glass and gravel, and falsely charged him with Assault on a Government Official and Resisting, Delaying, and Obstructing an Officer without probable cause.

96.     To be considered an adequate remedy to address a constitutional

wrong, "a plaintiff must have *at least* the opportunity to enter the courthouse doors and present his claim." Craig ex rel. Craig v. New Hanover Cty. Bd. of Educ., 363 N.C. 334, 339-40, 678 S.E.2d 351, 355 (2009) (emphasis added).

97.     U.S. constitutional claims seeking monetary damages against Defendant Smith in his official capacity, and therefore against the N.C. State Highway Patrol, are barred by sovereign immunity. Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L.Ed.2d 45 (1989),

98.     Therefore, Plaintiff does not have an adequate remedy to recover for N.C. State Highway Patrol's violation of his constitutional rights. *See* Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761 (1992).

99.     Plaintiff also has no adequate remedy under state law to recover for the N.C. State Highway Patrol's violation of his constitutional rights to be free from unreasonable seizure.

100.     Pursuant to the N.C. Tort Claims Act, Plaintiff is not permitted to bring the intentional tort claim of false imprisonment against a state agency. White v. Trew, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013) ("The North Carolina Torts Claims Act provides a limited waiver of immunity and authorizes recovery against the State for negligent acts of its 'officer[s], employee[s], involuntary servant[s] or agent[s].' But intentional acts of these individuals are not compensable. A suit against a public official in his official capacity 'is a suit against the State.' Therefore, sovereign immunity bars an

intentional tort claim against a public official in his official capacity.") (internal citations omitted).

101.    "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." Id. at 782 ("Therefore, the common law, which provides a remedy for every wrong, will furnish the appropriate action for the adequate redress of a violation of that right.").

102.    As a result of sovereign immunity and N.C. state law, Plaintiff does not have "*at least* the opportunity to enter the courthouse doors and present his claim" against N.C. State Highway Patrol for the violation of his constitutional rights.

103.    Therefore, Plaintiff brings a claim for unreasonable seizure under the N.C. Constitution pursuant to Corum and North Carolina Common Law against Defendant Smith in his official capacity.

## EIGHTH CLAIM FOR RELIEF
### N.C. Const. Art. I, §§ 19 & 20 - Excessive Force
### North Carolina Common Law - *Corum* Claim
### *On Behalf of Plaintiff Against Defendant Smith*
### *in his official capacity*

104.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

105.    Defendant Smith was acting in his official capacity as a law

enforcement officer when he violated Mr. Simmons' right to be free from excessive force.

106.     Article I, §§ 19 and 20 of the North Carolina Constitution prohibits excessive force. *See, e.g.*, State v. Otto, 366 N.C. 134, 136, 726 S.E.2d 824, 827 (2012); State v. Rouson, 741 S.E.2d 470, 471 (N.C. App. 2013).

107.     North Carolina appellate courts have construed search and seizure provisions in the North Carolina and federal constitutions as protecting the same rights against excessive force.

108.     However, North Carolina courts have also held that the rights secured under the North Carolina Constitution are broader than those secured under the federal constitution. *See, e.g.,* Virmani v. Presbyterian Health Servs. Corp., 350 N.C. 449, 475 (1999) (stating that "the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, while the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution"); Jones v. Graham Cnty. Bd. of Educ., 197 N.C. App. 279, 289–93, (2009) (noting that "[i]f we determine that the policy does not violate the Fourth Amendment, we may then proceed to determine whether Article I, Section 20 provides basic rights in addition to those guaranteed by the [Fourth Amendment]" (quotation omitted)).

109.     As discussed in Plaintiff's First Claim of Relief, Defendant Smith

violated Plaintiff's right to be free from excessive force under the N.C. Constitution when he punched Mr. Simmons in the face while he was having an epileptic seizure and after he was in a serious car accident. Defendant Smith was aware Mr. Simmons was having a medical emergency.

110.     U.S. constitutional claims seeking monetary damages against Defendant Smith in his official capacity, and therefore against the N.C. State Highway Patrol, are barred by sovereign immunity. Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304, 105 L.Ed.2d 45 (1989),

111.     Therefore, Plaintiff does not have an adequate remedy to recover for N.C. State Highway Patrol's violation of his constitutional rights. See Corum v. Univ. of N. Carolina Through Bd. of Governors, 330 N.C. 761 (1992).

112.     Plaintiff also has no adequate remedy under state law to recover for the N.C. State Highway Patrol's violation of his constitutional rights to be free from excessive force.

113.     Pursuant to the N.C. Tort Claims Act, Plaintiff is not permitted to bring the intentional tort claim of battery against a state agency. White v. Trew, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013).

114.     "[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." Id. at 782 ("Therefore, the common law, which provides a remedy for every wrong, will furnish the appropriate action for the

adequate redress of a violation of that right.").

115.    As a result of sovereign immunity and N.C. state law, Plaintiff does not have "*at least* the opportunity to enter the courthouse doors and present his claim" against N.C. State Highway Patrol for the violation of his constitutional rights.

116.    Therefore, Plaintiff brings a claim for excessive force under the N.C. Constitution pursuant to <u>Corum</u> and North Carolina Common Law against Defendant Smith in his official capacity.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays that the Court enter judgment on his behalf and order the following relief:

a.  Compensatory and punitive damages against the Defendant;

b.  Declaratory relief, to include an order declaring that Defendant Sergeant Smith's seizure of and use of excessive force against Plaintiff was unlawful and violative of the Fourth Amendment, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and North Carolina state and constitutional law;

c.  Pre-judgment and post-judgment interest and recovery of costs, as well as reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and other applicable laws; and

d.  Any other and further relief the Court deems equitable and just.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action on each of his claims.

Respectfully submitted, this the 23rd day of September, 2025,


*Jaelyn Miller*
Jaelyn D. Miller
N.C. Bar No. 56804
Ian A. Mance
N.C. Bar No. 46589
Dillon F. Sharpe
N.C. Bar No. 59647
EMANCIPATE NC
Post Office Box 309
Durham, North Carolina 27702
Tel: (919) 682-1149
Email: jaelyn@emancipatenc.org
Email: ian@emancipatenc.org
Email: dillon@emancipatenc.org
*Counsel for Plaintiff*